# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### AT URBANA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | **MEMORANDUM OF LAW IN** |
| Plaintiff, | ) | **SUPPORT OF MOTION FOR** |
| | ) | **PRELIMINARY INJUNCTION AND** |
| v. | ) | **TEMPORARY RESTRAINING** |
| | ) | **ORDER** |
| VIKRAM D. AMAR, et al., | ) | |
| | ) | Case No. |
| Defendants. | ) | 2:22-cv-02252 |
| | ) | |

## INTRODUCTION

Defendants, the University of Illinois Urbana-Champaign ("the University") and its officials have threatened Plaintiff, a second-year law student at the College of Law, with imminent disciplinary proceedings potentially leading to expulsion if he does not comply with an alleged "reasonable" directive to speak to the Behavioral Intervention Team ("BIT"). These are unlawful demands, and an immediate temporary restraining order ("TRO") and preliminary injunction are required.

BIT supposedly exists to prevent "targeted violence" against the University community. But BIT is supposedly "founded on the principles of early intervention and proactive engagement to prevent violence and provide supportive services. That is, an actual threat is immaterial. This creates the Plaintiff's present situation, where protected speech can be punished in the name of these goals. BIT encourages people to report any "concerning" behavior, such as anyone who has dealt with a "setback" like a

"termination" from a job or "humiliation" or "failed civil actions[,]"or has an

"[i]ncreasingly strident opinion." BIT is apparently not required to verify any of the

information it receives. BIT possesses the power to demand that a student come in for

what amounts to a forced mental health evaluation.

But the practice is unconstitutional. Plaintiff has already suffered serious harm in

the form of First Amendment retaliation and violation of his First Amendment rights.

Absent the Court's intervention, he will suffer irreparable harm—whether he is forced

to speak to BIT against his will, or is expelled from the law school, thereby destroying

his legal career. The "reasonable request" provision—i.e., § 1-302(g) of the Student Code

("Code"), also fails under the void-for-vagueness and overbreadth doctrines.

First, the University's demand is unconstitutional because it compels students to

speak against their will about the specific report that BIT received. The student must

justify and explain their speech based on the particular report or topics that BIT

demands. Here, the University wants Plaintiff to explain and justify his protected

speech, which he has no obligation to do. This practice also constitutes retaliation under

the First Amendment because faculty and staff are free to report protected student

speech to BIT. BIT can then use that protected speech against students to impose

additional requirements or to compel more speech during the student's forced

unofficial mental health evaluation.

Second, the University threatens students with discipline for failing to comply with a "reasonable" request from a school official under § 1-302(g) of the Code. But the University does not apply a reasonable person standard; instead, it construes the word "reasonable" as to mean, Humpty-Dumpty-like, whatever it says it means. Thus, § 1-302(g) is void-for-vagueness because it does not provide reasonable notice of the type of behavior that the school expects of students. It also fails under overbreadth because it can reach essentially any kind of speech, including vast swathes of protected speech. The report that BIT received is almost entirely filled with Plaintiff's protected First Amendment speech. More importantly, § 1-302(g) fails under both doctrines because it can be administered arbitrarily and capriciously to chill protected free speech. The University does not mention BIT in the conduct section of the Code; instead, it uses § 1-302(g) to compel speech and report protected speech. The school is doing this to Plaintiff today, but they could do it to any other student tomorrow.

Plaintiff is likely to prevail on the merits of his claims and meets all the remaining injunction criteria. A preliminary injunction would not harm the University's interests in promoting constitutional policies that advance school safety. Students would still be free to voluntarily speak to BIT.  But the public has a strong interest in making sure that the University does not engage in unconstitutional acts in the name of safety. And denying Plaintiff's motion would allow the College of Law to expel Plaintiff

3

and destroy his legal career. Thus, the Court should grant Plaintiff's motion and issue a TRO while the motion is pending.

## BACKGROUND

### I.     The Code & Handbook

The Code and College of Law Handbook ("Handbook") govern the conduct for law students at the College of Law. *See* Code, *available at* https://studentcode.illinois.edu (last visited Nov. 17, 2022); Ex. A. The Handbook incorporates the Code. Ex. A at 34. Section 1-302 of the Code governs the rules of conduct for students, but it does not mention BIT. *See generally* Code; Ex. A. BIT is supposedly "not disciplinary in nature," *see* Ex. B at 2, but the Senate Committee on Student Discipline recommends dismissal for failing to speak to BIT when directed. Ex. C at 6; Ex. B at 25. In fact, the same Senate Committee recommends *less* discipline for an actual threat, *see* Ex. C at 3, and it recommends only a censure for not complying with a "reasonable" request under § 1-302(g). *See* Ex. C at 6. The University is more concerned with obedience than with safety. BIT is referenced in Section 2-901, which allows the school to start a process of an "involuntary withdrawal" of a particular student. Code § 2-901. Once BIT is involved, it possesses the power to force students to take additional actions, and the school can remove a student under this provision. *See id.* There does not appear to be any standards of proof or evidence for this process. *See id.*

4

## II.     BIT

BIT has broad power to oversee students in a variety of contexts. *See generally* Ex.

D. It supposedly exists to prevent "targeted violence" against the community. *Id.* at 4.

But BIT asks people to report a broad range of conduct, which in many cases would not

support a prima facie case of danger. For example, BIT asks people to report anyone

who has dealt with a "termination" from a job or who has suffered "humiliation" or

who appears entitled and "self centered[]." *Id.* at 5. They also ask people to report

anyone who has had a "setback" such as "failed civil actions[,]" *id.*, or anyone who has

an "[i]ncreasingly strident opinion." *Id.* at 7. All of these examples implicate the First

Amendment; all are protected speech or conduct.

## III.     The University's Unlawful and Unconstitutional Commands to Plaintiff

### A.     Complaints & Meetings

Plaintiff was admitted to the College of Law with a full-tuition scholarship; his

legal education began in August 2021. The College of Law held several "Law 101"

events, where first-year students received advice on various law school related matters.

Attendance was compulsory. At one such event, Dean Vermillion said that students

should amend their applications if needed for future bar association character and

fitness reviews. Vermillion declared that she had "many" friends inside the Federal

Bureau of Investigation ("FBI"), but that the bar associations were tougher.

Plaintiff met with Vermillion in her office to amend his application. Vermillion verbally abused him and made bigoted comments about his race, religion, national origin, and ethnicity. Hard as it is to believe, Vermillion said "You f*ing middle easterners are untrustworthy." Plaintiff was flabbergasted at this. She also repeated that she had "many" friends inside the FBI. Plaintiff became concerned about discrimination because he is a Sikh male, and Sikhs have been subject to racial profiling by law enforcement. Sikhs are not Muslims or Middle Eastern—even though they are often misidentified.[1] Plaintiff did not report the comments out of fear of retaliation and concern that Vermillion would report him to her friends inside the FBI. If Plaintiff did not have a full-tuition scholarship, he would have explored a transfer.

Following fall 2021, Plaintiff communicated to the administration that he would consider filing capricious grading complaints against instructors, which is allowed under Code § 3-107. In February 2022, Deans Winship and Vermillion demanded that Plaintiff meet at their office. Dean Winship invoked the broad "reasonable" request provision in § 1-302(g). In this meeting, they accused Plaintiff of being "unprofessional" for wanting to file complaints. Plaintiff said that he would consider taking legal action.

In March 2022, Plaintiff requested a meeting with Deans Amar and Vermillion. He discussed his concerns from the February 2022 meeting and his worries about

---

[1] *See, e.g.*, Emma Green, *The Trouble With Wearing Turbans in America*, The Atlantic (Jan. 27, 2015), https://www.theatlantic.com/politics/archive/2015/01/the-trouble-with-wearing-turbans-in-america/384832/.

retaliation, as well as about possible law enforcement involvement due to Vermillion's bigoted comments and her statements about her "many" friends inside the FBI. Plaintiff's concerns had a clear basis in fact, as he is Sikh, and he had dealt with discrimination before. Plaintiff told the College of Law that he would file a lawsuit if necessary to protect his rights. *See* Ex. F.

### B.    BIT Involvement

Unbeknownst to Plaintiff, Vermillion filed a report with BIT in April 2022 about Plaintiff's mental state. In June 2022, Plaintiff received a letter from Defendant Katherine Snyder, a member of BIT. *See* Ex. B at 1. Snyder claimed that her office had received "reports regarding conflicts between [Plaintiff] and faculty/staff in the College of Law, including concerns [Plaintiff] . . . raised about coursework and grades." *Id.* Snyder requested a meeting before June 29, 2022, and said that the meeting was a "necessary and required step in the process." *Id.* She did not explain what "process" or what Plaintiff had done to require a meeting with BIT. *See id.*

Plaintiff declined Snyder's request, who wrote him again demanding a meeting by July 13, 2022. *Id.* at 2. She threatened Plaintiff with discipline for noncompliance. *Id.* Plaintiff sent Snyder a two-page letter with his objections to her demands, most notably that the University had provided no basis to suggest that a meeting was necessary. *See id.* at 3–4. Snyder did not respond.

Plaintiff then filed an official request under the Family Educational Rights and Privacy Act ("FERPA"), in hopes of finding out why he was referred to BIT. *Id.* at 5. Plaintiff also filed a discrimination complaint to the Office of Access & Equity, though he did not provide details out of fear of retaliation and concern of being reported to Vermillion's friends inside the FBI. *Id.* at 6–8. Plaintiff reviewed his records at the College of Law but did not find anything about BIT.

On August 23, 2022, Defendant Justin Brown, also a member of BIT, sent Plaintiff a message demanding a meeting and saying Plaintiff had not complied with a "reasonable request by a university official." *Id.* at 10. Plaintiff asked for evidence and the school's authority for this requirement. *Id.* at 11. Plaintiff told Brown that it was an unreasonable request under § 1-302(g), and therefore he would not comply because he had not done anything to justify having to meet with BIT. Ex. B at 15–16. Plaintiff then told Winship that he would take legal action if the school continued to harass him with demands to speak with BIT. *Id.* at 17.

A few weeks later, Dean Winship wrote that Plaintiff had unspecified "conflicts" with individuals and that he must meet with BIT forthwith. *Id.* at 18. Once again, Winship provided no explanation of why Plaintiff's actions necessitated a meeting with BIT. Plaintiff filed a retaliation complaint to Human Resources regarding the school's unlawful demands. *Id.* at 20. There is no indication that Human Resources ever

investigated the matter. Winship sent another message on September 19, 2022, demanding a meeting. *Id.* at 21.

On October 18, 2022, Dean Winship wrote that Plaintiff must meet with BIT by October 25, 2022, or the College of Law would "start the disciplinary process." *Id.* at 22. Winship also negatively characterized Plaintiff's interactions with unspecified students. *See id.* Plaintiff sent BIT a message requesting evidence. *Id.* at 23. Katherine Snyder responded the next day that she had construed his message as a "request" under FERPA. *Id.* at 24. On October 25, 2022, Defendant Robert Wilczynski responded that Plaintiff could be dismissed from the University for failing to comply with BIT. *Id.* at 25. This was the first time Plaintiff was told that he could be dismissed, as that information is not in the Code, and no one had mentioned it previously.

Plaintiff finally saw Dean Vermillion's April 2022 report to BIT for the first time on October 28, 2022. Her report had distorted much of the March 2022 meeting. She claimed, among other things, that Plaintiff made "threats" during the March 2022 meeting and that he had "disjointed" thoughts. She also incorrectly quoted Plaintiff as using the word "dangerous" to suggest that "harm" would occur to the school. Plaintiff never said that. Plaintiff only said that he would take legal action regarding the University's violations of his rights. *See* Ex. F. The remainder of the report contained invidious characterizations of communications that Plaintiff had with various members of the College of Law, including female professors. e.g., as aggressive or combative.

Plaintiff disagrees with these characterizations; but regardless of Plaintiff's tone, nothing in the report explained why Plaintiff's interactions required the involvement of BIT, whose mandate is to prevented "targeted violence."

The College of Law apparently acted on Vermillion's report by segregating Plaintiff from female students. Plaintiff was only assigned to men for team assignments and other schoolwork, and he was separated from the women students during law review cite checks. *See generally* Ex. E. Plaintiff told Clare Donohue, Editor-in-Chief of the *University of Illinois Law Review*, and Sam Barder, the Managing Editor, that he was uncomfortable being assigned to only men for cite checks. *See id.* The pair responded defensively. *See id.* Soon after, Winship sent Plaintiff the October 18th letter, where she negatively characterized Plaintiff's interactions with students without proving specifics. *See id.*; Ex. B at 22.

On November 4, 2022, Plaintiff and his counsel met with Deans Amar and Winship with their attorney. Defendants demanded that Plaintiff speak with BIT or face immediate dismissal from the school. Defendants refused to consider any other options. They presented Plaintiff with a fait accompli. Defendants referenced Vermillion's report and read some of Plaintiff's communications out loud. However, Amar conceded that there was no threat or implication of a threat in Plaintiff's communications. Plaintiff apologized to Dean Amar for any confusion regarding his statements about law enforcement. Plaintiff also expressed concerns of discrimination

10

in light of Sikhs being mischaracterized as Muslims or Middle Eastern. Amar dismissed Plaintiff's concerns and demanded again that he speak with BIT. Dean Winship repeated her claims that Plaintiff had unspecified "conflicts" with unspecified individuals. *Cf.* Ex. B at 18, 22. Winship repeated that Plaintiff would likely be dismissed for not complying with BIT. The pair dismissed Plaintiff's concerns and repeated that dismissal was imminent. They made it clear that they would likely not seek a lighter sentence.

## ARGUMENT

To obtain a preliminary injunction or TRO, "a plaintiff must show that: "(1) without this relief, [he] will suffer irreparable harm; (2) traditional legal remedies would be inadequate; and (3) [he] has some likelihood of prevailing on the merits of its claims." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020). "If a plaintiff makes such a showing, the court then must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Id.*

Before proceeding to the merits, the Court must first determine whether Plaintiff has standing. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiff satisfies all three standing elements. The University has sent Plaintiff's

11

protected speech to BIT and demanded that Plaintiff speak to BIT against his will. Although the First Amendment injury is enough, the College of Law is also threatening imminent dismissal from the school if Plaintiff does not comply. The threats establish an indisputable connection to the University, and the harm would be redressed by having the Court grant an injunction.

The Court should grant Plaintiff's motion for a TRO and preliminary injunction. Plaintiff is likely to succeed on the merits of his claims and will suffer irreparable harm in the form of an imminent dismissal from the law school absent the Court's intervention.

## I.    Plaintiff is Likely to Succeed on the Merits of His First Amendment Claims

The Supreme Court has said "time and again that freedom of speech includes both the right to speak freely and the right to refrain from speaking at all." *Janus v. AFSCME*, 138 S. Ct. 2448, 2463 (2018) (internal quotations and citations omitted). "Whenever the Federal Government or a State prevents individuals from saying what they think on important matters or compels them to voice ideas with which they disagree, it undermines these ends." *Id.* at 2464. That does not change just because a school happens to be involved. "In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969) "[Students] cannot be punished merely for expressing their personal views on the

school premises . . . unless school authorities have reason to believe that such

expression will 'substantially' interfere with the work of the school or impinge upon the

rights of other students." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988)

(quoting *Tinker*, 393 U.S. at 509); *see also Healy v. James*, 408 U.S. 169, 180 (1972) ("[S]tate

colleges and universities are not enclaves immune from the sweep of the First

Amendment.").

In fact, "First Amendment protections [do not] apply with less force on college

campuses than in the community at large." *Healy*, 408 U.S. at 180 (1972). Rather, "[t]he

mere dissemination of ideas — no matter how offensive to good taste — on a state

university campus may not be shut off in the name alone of 'conventions of decency.'"

*Papish v. Bd. of Curators of Univ. of Mo*, 410 U.S. 667, 670 (1973) (per curiam) (First

Amendment violation even when the student violated the school's student code).

A. **The University's Demands to Speak Violate Plaintiff's Right Not to Engage in Compelled Speech**

The University and College of law are depriving Plaintiff of his right to refrain

from compelled speech. "When speech is compelled . . . damage is done." *Janus*, 138 S.

Ct. at 2464. "Forcing free and independent individuals to endorse ideas they find

objectionable is always demeaning, and for this reason, one of our landmark free speech

cases said that a law commanding 'involuntary affirmation' of objected-to beliefs would

require 'even more immediate and urgent grounds' than a law demanding silence." *Id.*

(citations omitted). Further, students at public schools do not "shed their constitutional rights to freedom of speech . . . at the schoolhouse gate." *Tinker*, 393 U.S. at 506.

The government compels speech when it threatens to discipline students who refuse to participate in a specific program against their will. *See Miller v. Skumanick*, 605 F. Supp. 2d 634, 640, 644 (M.D. Pa. 2009), *aff'd sub nom. Miller v. Mitchell*, 598 F.3d 139, 150 (3d Cir. 2010). In *Miller*, a group of teens were caught sharing sexually explicit messages with each other—i.e., "sexting." *Miller*, 605 F. Supp. 2d at 637–40. The prosecutor threatened to criminally prosecute the teens if they did not participate in a program to show why their actions were wrong. *Id.* at 640, 644. The teens claimed that they had done nothing wrong, and so, in their view, forced participation was compelled speech. The district court agreed and granted the plaintiff's motion for a preliminary injunction. *Id.* The district court later granted a permanent injunction. *See Miller v. Mitchell*, No. 3:09-cv-540, 2010 WL 1779925, at *6 (M.D. Pa. Apr. 30, 2010).

Here, the College of Law is threatening to expel Plaintiff and destroy his legal career if he does not speak to BIT. Plaintiff has told the University repeatedly that he has done nothing wrong. *See generally* Ex. B. The University says that BIT is not "disciplinary in nature." *Id.* at 2. But the program in *Miller* was not either. *See Miller*, 605 F. Supp. 2d at 640, 644. The prosecutor threatened prosecution *if the teens did not participate in the program*. *Id.* at 637–40. Here too, the College of Law threatens to expel Plaintiff *if he does not comply and speak to BIT against his will*. *See* Ex. B. at 22. Thus, the

cases are factually on all fours. *See Miller*, 605 F. Supp. 2d at 637–44. Noteworthy is that the *Miller* plaintiffs were merely required to participate, not to affirm any particular statements, such as a pledge of allegiance. *Cf. W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 627 (1943). Similarly, the plaintiff in *Janus* was not required to affirm any particular statements or views; rather, he had to contribute financially to a union whose perspective he generally disagreed with. *Janus*, 138 S. Ct. at 2460. Thus, being required to expressly affirm something ones disagrees with is not necessary for a compelled speech violation.

But here, the University *does* want Plaintiff to explain and justify himself to BIT about the concerns raised by the College of Law. *See* Ex. B at 1 (Defendant Katherine Snyder saying that she wanted to discuss "these" concerns (those raised, however vaguely)); *id.* at 10 (Defendant Justin Brown saying that BIT was "interested in talking with [Plaintiff] about [his] experiences in the College of Law, email exchanges [it had] been provided, and other such topics"); *id.* at 22 (Dean Winship echoing Brown's message). The University wants Plaintiff to justify and explain his First Amendment protected speech. Moreover, when Plaintiff voluntarily explained some of his actions to Dean Amar at the November 4th meeting, Amar directed Plaintiff to say "just that" to BIT—i.e., to make specific affirmations. Constitutionally, Plaintiff is under no obligation to do so. The speech is protected. But forcing Plaintiff to make such an affirmation would be consistent with BIT's role. *See generally* Ex. D; *see* Ex. B at 12 (describing

meeting as required so that BIT could "fulfill its role"); Ex. B at 22 (same). BIT exists to prevent "targeted violence," but the University wants Plaintiff to explain and justify his protected speech even though there is no evidence of a threat in his communications. *See Tinker*, 393 U.S. at 508; *Janus*, 138 S. Ct. at 2464; *cf. Miller*, 605 F. Supp. 2d at 637–44 (granting preliminary injunction).

The fact that the school is threatening discipline as opposed to a prosecutor filing a criminal charge makes no difference. Nothing suggests that Plaintiff's actions or communications were disruptive or threatening. Dean Amar conceded on November 4th in front of Plaintiff's counsel and his own counsel that there was no evidence of a threat in the record. Further, the school possesses power to discipline students for threats or disruptive *behavior, see* Ex. C, but it has chosen not to discipline Plaintiff for any of his statements; the threat of discipline is only for not speaking to BIT.  Once again, compliance over safety. Plaintiff simply wants to finish his time at the College of Law and obtain his J.D. in peace. He only wants the College of Law to leave him be.

> **B.**    **The University is Retaliating Against Plaintiff in Violation of Plaintiff's First Amendment Rights**

"To establish a prima facie case of unlawful retaliation, a plaintiff must show (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020) (internal

16

quotations and citation omitted). The Seventh Circuit has recognized that a plaintiff's exercise of "[t]he First Amendment right to petition the government for the redress of grievances" may qualify for the first prong of a First Amendment retaliation claim. *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008). Furthermore, the right to petition "extends to the courts in general and applies to litigation in particular." *Id.*; *see also Walker v. Bertrand*, 40 F. App'x 988, 989–90 (7th Cir. 2002) (administrative complaints qualify). The causation element only requires the plaintiff to show that the activity motivated the defendants in some way. *See Woodruff*, 542 F.3d at 551. The plaintiff can show this through "direct" or "circumstantial" evidence, *id.*, such as a close temporal connection, which exists here between Plaintiff's statements of intent to file administrative complaints or litigation in March and April 2022, and Dean Vermillion's report to BIT in April 2022. Plaintiff has found no case law anywhere on whether expressed intentions to take protected administrative or legal action is also itself protected action for purposes of a retaliation claim, but he submits that it is a reasonable extension by analogy, and should be so treated.

Here, Plaintiff sent protected First Amendment communications to faculty and staff and said he would file complaints and lawsuits against various officials. Ex. F. Defendants then sent his protected speech to BIT soon after the communications and threatened him with discipline. Plaintiff suffered a deprivation because he now fears being reported to BIT if he speaks. Plaintiff's communications *were* the reason that the

College of Law reported his communications to BIT. *Id.* Therefore, the University

retaliated against Plaintiff based on his protected First Amendment speech.

> ### C.   The University is Clearly Violating the Established Law of *Tinker*.

Independent of retaliation, the University has threatened to punish Plaintiff for

protected First Amendment conduct, which illegally chills Plaintiff's free speech rights.

The *Tinker* substantial disruption standard is the default rule in the Seventh Circuit. *See*

*N.J. by Jacob v. Sonnabend*, 37 F.4th 412, 424 (7th Cir. 2022). In *Sonnabend*, a high school

student sued to stop the enforcement of a dress code policy. *Id.* at 419. The court noted

that there were three categories of speech that the Supreme Court had allowed public

schools to regulate post-*Tinker*. *Id.* at 423. The first category was regarding "indecent" or

"vulgar" or "lewd speech." *Id.* The second category was speech encouraging "illegal

drug use." *Id*. And the third category dealt with expression that might "bear the

imprimatur of the school." *Id.* at 424 (citing *Hazelwood*, 484 U.S. at 271). However, the

court noted that the *Hazelwood* standard had to do with forum analysis related "*to

legitimate pedagogical concerns*." *Id.* (emphasis added) (citing *Hazelwood*, 484 U.S. at 273).

If the speech in question does not fall into any of those three categories, "[t]he default

rule is . . . *Tinker*." *Id.*

Further, "[t]he application of *Tinker* must account for such factors as the *age* and

*grade level* of the students to whom the speech is directed . . . ." *Id.* at 426 (emphasis

added). Indeed, "the inquiry [also] accounts for the *professional knowledge* and *experience*

*of school administrators* in setting and enforcing disciplinary standards." *Id.* (emphasis

added). Additionally, a school cannot punish a student because it possesses an

"undifferentiated fear[]" that the conduct or speech of a student may cause a

disturbance. *Tinker*, 393 U.S. at 508. "Undifferentiated fear" precisely describes the

situation in this case.

Plaintiff has not uttered any lewd, vulgar, or indecent speech. *See generally* Ex. B.

Nor has he encouraged illegal drug use. *Id.* Nor has he engaged in activity in a school

newspaper that relates to pedagogical concerns. *Id.* None of the communications in

question have anything to do with pedagogical concerns or things relating to classroom

learning. *See id.* Instead, the College of Law bases its objections on Dean Vermillion's

April 2022 report and its apparent disagreements with Plaintiff about characterizations

or various factual matters. *See, e.g.*, *id.* Therefore, Plaintiff's communications should be

analyzed under *Tinker*. *See Sonnabend*, 37 F.4th at 424 ("[t]he default rule is . . . *Tinker*").

The school has provided no evidence or basis to suggest that Plaintiff's communications

or conduct caused any disruption at all—notwithstanding the *substantial* disruption that

would have to exist to satisfy *Tinker*. *See Tinker*, 393 U.S. at 508.

First, Vermillion sent the report to BIT in April 2022. Yet, BIT did not contact

Plaintiff until June 2022. *See* Ex. B at 1. If Plaintiff's conduct was threatening or

disruptive, why did the school wait two months? Why did they not discipline him for

his statements or conduct under the University's Code? *See generally* Ex. C (describing

discipline for conduct like disruptive or threatening behavior). More importantly, the

University and College of Law have ignored Plaintiff's responses every step of the way.

Plaintiff told Katherine Snyder in July 2022 that he disputed the information in the

report. *See* Ex. B at 3–4. Neither the University nor the College of Law ever bothered to

respond to Plaintiff. Instead, they waited nearly two months before reaching out and

demanding another meeting. *See id.* at 10. When Plaintiff raised further objections, the

University and College of Law continued to ignore him. They would simply wait a few

weeks, or in some cases, months before demanding more meetings. *See, e.g., id.*, 1–2, 10,

18, 21, 22. Thus, the University and College of Law have defeated themselves by their

actions. This whole ordeal started in April 2022, and it is now November 2022.

The University and College of Law have also been misleading, even deceptive,

throughout this entire process. Plaintiff's initially denied the allegations and demanded

to see the evidence. *See id.* at 3–4. The University did not respond. Plaintiff then filed a

FERPA request to see his records. *See id.* at 5. Dean Winship responded that she

believed Plaintiff's "concerns [we]re ill-founded." *Id.* at 9. But she knew that the

evidence was not in those records. Plaintiff did not see anything about BIT until

October 28, 2022—more than four months from the initial communication from Snyder,

and more than six months from Vermillion's filing of the initial report. Simply put, the

school has no basis to strip Plaintiff of his First Amendment rights. *See Tinker*, 393 U.S.

at 508; *Sonnabend*, 37 F.4th at 423–26. Rather, the school tried to buffalo Plaintiff into

voluntarily complying to get him to forfeit his First Amendment rights.

Second, the school bases its objections with Plaintiff's communications on its

apparent disagreement with Plaintiff on characterizations and various factual matters.

For example, in the November 4th meeting, Dean Amar expressed his disagreement

with Plaintiff that law enforcement may have been involved with the law school.

Because Amar and the administration believe that Plaintiff's claims have no basis in

fact, they feel that they are justified in stripping Plaintiff of his constitutional rights. But

that clearly violates *Tinker*. *See Tinker*, 393 U.S. at 511 (students are not "confined to the

expression of those sentiments that are officially approved"). "In the absence of a

specific showing of constitutionally valid reasons to regulate their speech, students are

*entitled to freedom of expression of their views*." *Id.* (emphasis added).

The truth or warrant of Plaintiff's claims are irrelevant in determining whether

the College of Law may deprive Plaintiff of his First Amendment rights. *See id.* Absent a

substantial disruption, Plaintiff is entitled to his *opinion* on various matters—whether it

is regarding law enforcement or anything else, even if it is wrong or unreasonable. *See

id.*; *Sonnabend*, 37 F.4th at 423–26. Attempting to suppress Plaintiff's opinions for no

good reason would "obvious[ly] . . . violate the constitutional rights of [Plaintiff]."

*Tinker*, 393 U.S. at 513. Further, Plaintiff's assertions had a clear basis in fact. Dean

Vermillion had made bigoted comments about Plaintiff's race, ethnicity, national origin,

and religion. She also repeatedly made public and private statements about her "many" friends inside the FBI. Any reasonable person would have been alarmed by those statements. Plaintiff filed a discrimination complaint but did not provide details out of fear of retaliation and concern of being reported to Vermillion's friends inside the FBI. *See* Ex. B at 6–8.

But in any case, Plaintiff is not required to *prove* the truth of his statements to be able to utter them on campus. *See Tinker*, 393 U.S. at 513. Many students possess controversial opinions on campus. For example, many people still believe that the 2020 presidential election was rigged (Plaintiff is not one of them).[2] Some of these people may be students on campus. Does that mean that the University can refer these students to BIT? This likely would satisfy the "[i]ncreasingly strident opinion" that BIT discusses in its areas of concern. *See* Ex. D at 7. Many people also believe in creationism (Plaintiff is not one of them). Some of these people may be students on campus. Does that mean that the University can refer these students to BIT? This probably satisfies BIT's broad standards as well *See id.* at 7. Yet, there is no evidence that the University is referring those students to BIT, which raises additional concerns. Why is the College of Law so intent on depriving Plaintiff of his constitutional rights?

---

[2] *See, e.g.*, Mark Murray, *Poll: 61% of Republicans still believe Biden didn't win fair and square in 2020*, NBC News (Sept. 27, 2022, 11:21 AM), https://www.nbcnews.com/meet-the-press/meetthepressblog/poll-61-republicans-still-believe-biden-didnt-win-fair-square-2020-rcna49630.

22

Further, the Court must evaluate the University and College of Law's actions in the context of the school environment. The College of Law is comprised of *adults*. Almost every student (if not every student) is over the age of twenty-one. Plaintiff is older than average, as he is in his late twenties. The University does not have the same rights to restrict speech as a public school would in the K-12 context. *See Sonnabend*, 37 F.4th at 426. "The application of *Tinker* must account for such factors as the *age* and *grade level* of the students . . . ." *Id.* (some emphasis added). Although the undergraduate population is a few years younger, the vast majority of students are over the age of eighteen. The University has no *in loco parentis* authority. The College of Law has an even shorter leash. Plaintiff is not a child, and the other students at the College of Law are not either. *See id.*

The shorter leash conclusion is bolstered by the fact that the College of Law's administration is comprised of people that went to law school. Dean Amar went to Yale and clerked on the Supreme Court; Dean Winship went to Harvard. *See id.* ("the inquiry [also] accounts for the *professional knowledge* and *experience of school administrators* in setting and enforcing disciplinary standards") (emphasis added). The College of Law knew that this issue implicated the First Amendment because Plaintiff told them. And they should have known anyway. Therefore, the University and College of Law retaliated against Plaintiff and attempted to punish his protected speech in violation of

the First Amendment. Again, Plaintiff simply wants to finish his time at the College of

Law and obtain his J.D. in peace. He only wants the College of Law to leave him be.

## II.   Code § 1-302(g) Fails Under the Void-for-Vagueness and Overbreadth Doctrines

### A.   Void-for-Vagueness

An enactment is void-for-vagueness if it is not clearly defined. *See, e.g., Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Further, an enactment fails if "if it: (1) does not provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited, or (2) fails to provide explicit standards to prevent arbitrary and discriminatory enforcement by those enforcing the [enactment]." *United States v. Plummer*, 581 F.3d 484, 488 (7th Cir. 2009). If an enactment reaches protected First Amendment conduct, "the [void-for-vagueness] doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1984). In the University context, a student code provision "must give adequate warning of the conduct which is to be prohibited and must set out explicit standards" for its application. *UWM Post, Inc. v. Bd. of Regents of Univ. of Wis. Sys.*, 774 F. Supp. 1163, 1178 (E.D. Wis. 1991). "These concerns apply with particular force where the challenged [provision] affects First Amendment rights." *Id.*

A student code provision violates the First Amendment if it can reasonably be interpreted in various ways. *Id.* at 1180–81. In *UWM Post*, the University of Wisconsin had a provision that punished "discriminatory comments, epithets and expressive

behavior." *Id.* at 1180. The district court struck down the provision as vague because it was interpreted in multiple ways, and it was unclear how much the individual must have demeaned the other person. *Id.* at 1180–81.

Here, the provision of the University's Code threatens discipline if a student "fail[s] to comply with reasonable directions of a member or agent of the university acting in the performance of their duty." Code § 1-302(g). The University provides no definition or guidance on how it will use the provision. But the College of Law uses the provision here, on pain of *expulsion* to demand that Plaintiff talk to BIT. That will not fly. *See Plummer*, 581 F.3d at 488 (provision fails if it allows for arbitrary and discriminatory enforcement); *UWM Post*, 774 F. Supp. at 1178 (a student code provision "must give adequate warning of the conduct which is to be prohibited and must set out explicit standards for those who apply it"). Code § 1-302(g) is woefully deficient, and thus, it fails under the void-for-vagueness doctrine.

### B.    Overbreadth

"It has long been recognized that the First Amendment needs breathing space and [provisions] . . . must [reflect] . . . that a particular mode of expression has to give way to other compelling needs of society." *Broadrick v. Oklahoma*, 413 U.S. 601, 611–12 (1973). Overbroad laws deter "people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas." *United States v. Williams*, 553 U.S. 285, 292 (2008). Thus, a provision "is facially invalid if it prohibits a substantial amount of

protected speech." *Id.*; *see also McCauley v. Univ. of V.I.*, 618 F.3d 232, 241 (3d Cir. 2010) (a college provision "may be struck down on its face . . . if it reaches too much expression that is protected by the Constitution"). Overbreadth analysis has two steps: First, the court "construes" the challenged provision. *Williams*, 553 U.S. at 293. Second, the court evaluates whether the provision, as constructed, punishes "a substantial amount of protected expressive activity." *Id.* at 297.

Here, the University's provision fails under the first step. *See Williams*, 553 U.S. at 293. It is not even clear how you could construe § 1-302(g). The provision states that a student must comply with any "reasonable" directive by a "member or agent" of the University—which includes a large number of people. Code § 1-302(g). The fact that the College of Law is construing the language to force compelled speech suggests that it could apply to just about all speech. Nothing suggests that there are any limiting principles. Thus, the provision fails under the overbreadth doctrine because it can chill speech in a wide variety of contexts. *See Williams*, 553 U.S. at 292. Plaintiff filed various complaints about discrimination or grading. These complaints are allowed under the University's Code and are protected First Amendment speech. *See, e.g.*, Code § 3-107. The College of Law sent these complaints to BIT—thereby chilling Plaintiff's speech. The University is also using the "reasonable" request provision to chill his speech because they find the filing of these permitted complaints "unprofessional." This is unacceptable. *See Williams*, 553 U.S. at 292.

However, even if the University construed the language to only require students to speak to BIT, it would still fail under the second step. *See id.* at 297. The second step asks whether the provision punishes "a substantial amount of protected expressive activity." *Id.* The BIT process implicates a "substantial amount of protected expressive activity." *Id.* BIT asks people to report a broad range of conduct, which in many cases would not support even a prima facie case of dangerous behavior. For example, BIT asks people to report anyone who has suffered "humiliation" or a "termination" from a job or "failed civil actions[,]"or anyone who appears "self-centered[]." Ex. D at 5. They also want reports on anyone who has an "[i]ncreasingly strident opinion." *Id.* at 7.

What about the creationists? How about the election deniers?[3] The University has already dealt with accusations before about their intolerance of political speech. *See Killeen*, 968 F.3d at 632–37. What about people who have conservative or libertarian viewpoints? What about people who hold socialist or communist viewpoints? Many of Plaintiff's law school classmates have voiced support for socialist or communist viewpoints. Many were (or are) Bernie Sanders supporters. Are they going to be reported next? The answer should be a resounding no. No one should be reported to BIT under present University standards because the First Amendment protects all of the

---

[3] *See* Murray, *supra* note 2.

above. If BIT can be used to go after any of the above categories, none of the remaining

categories are safe.[4] Therefore, § 1-302(g) fails under the overbreadth doctrine.

## CONCLUSION

The Court should grant Plaintiff's motion for a preliminary injunction and a TRO

while the motion is pending.

Respectfully submitted,

Dated:  November 18, 2022

/s/Justin Schwartz
Justin Schwartz
ARDC No. 627328
1723 Devon Ave. # 607882
Chicago, IL 60660
(847) 687-5477
justinschwartzlaw@gmail.com

---

[4] "First they came for the Communists, and I did not speak out—because I was not a Communist . . . . Then they came for the Jews, and I did not speak out—because I was not a Jew. Then they came for me—and there was no one left to speak for me." —Martin Niemöller. Quoted in Note by Veni Markovski, *available at* https://www.veni.com/articles/firsttheycameforme.html (last visited Nov. 17, 2022).

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with Local R. 7.1, in that it contains 6,985

words, excluding the words in this certificate.

Dated:  November 18, 2022                                 Respectfully Submitted,

                                                                                /s/Justin Schwartz